**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GLOBALROCK NETWORKS, INC.,**

                                        **Plaintiff,**

          **vs.**                                        **1:09-CV-1284**
                                                         **(MAD/RFT)**

**MCI COMMUNICATIONS SERVICES,**
**INC., d/b/a Verizon Business Network**
**Services,**

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

HERZOG LAW FIRM, P.C.                    Keith J. Roland, Esq.
7 Southwoods Boulevard
Albany, New York 12211
_Attorneys for Plaintiff_

KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, PLLC                      Melanie L. Bostwick, Esq.
1615 M. Street NW, Suite 400            Scott H. Angstreich, Esq.
Washington, D.C. 20036                  Brendan J. Crimmins, Esq.
_Attorneys for Defendant_

PHILLIPS LYTLE LLP                       William D. Christ, Esq.
Omni Plaza                               Marc H. Goldberg, Esq.
30 South Pearl Street
Albany, New York 12207
_Attorneys for Defendant_

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        Plaintiff GlobalRock Networks, Inc. ("plaintiff" or "GlobalRock") commenced this action

against MCI Communication Services, Inc., ("MCI") doing business as Verizon Business

Network Services ("Verizon" or "defendant"), alleging causes of action for breach of contract,

fraud and gross negligence in connection with Verizon's provision of telecommunication services to GlobalRock. Presently before the Court are three motions. Defendant moves for summary judgment and dismissal of plaintiff's complaint and for summary judgment and an award of damages on defendant's counterclaims pursuant to Fed. R. Civ. P. 56. (Dkt. No. 95). In the alternative, defendant moves to exclude the proposed expert testimony of Stu Sleppin and David J. Malfara (Dkt. Nos. 94 and 96). Plaintiff has opposed the motions.

## BACKGROUND[1]

Defendant is a provider of wholesale and retail long-distance telecommunications services. Plaintiff is a prepaid calling-card provider selling calling cards that have a preset value and function like debit cards. Customers who purchase the calling cards dial a toll-free access

---

[1] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3)(emphasis in original).

Defendant filed a Statement of Material Facts and plaintiff properly responded. Plaintiff also set forth additional material facts. Defendant did not respond to these additional assertions in the reply submission. The background set forth in this section is taken from: (1) defendant's Statements of Material Facts and plaintiff's responses therein; (2) the exhibits and evidence submitted by defendant in support of the motion for summary judgment; and (3) the exhibits and evidence submitted by plaintiff in opposition to the motion for summary judgment. To the extent that the "additional facts" asserted by plaintiff in the Statement of Material Facts are supported by the record, the Court will consider them in the context of the within motion. The facts recited are for the relevant time period as referenced in the amended complaint.

number printed on the cards to reach GlobalRock's calling card platform.  The customer is then prompted to enter a PIN number, also printed on the calling card, which allows GlobalRock's calling card platform to authenticate the customer and ensure that the card has adequate funds. After the customer is authenticated, plaintiff is prompted to enter the destination number (the number of the person that the customer is trying to call).  Plaintiff's calling card platform determines what rate will apply to the call and whether any surcharges will be imposed.  The calling card platform also determines which outbound carrier plaintiff should send the call to for delivery to its destination (in telecommunications terms, "terminate" the call).  This determination is made based on the least-cost routing process.  This process identifies the possible carriers and sorts the carriers in an attempt to place the call through the carrier that will charge the lowest price.  As the call progresses, plaintiff's calling card platform deducts money from the card until the call ends or until the fund's on the card are depleted.

Telecommunications Services Agreement

In 1999, plaintiff's predecessor-in-interest and defendant's predecessor-in-interest entered into a contract, the Telecommunications Services Agreement ("TSA").  The TSA governed plaintiff's purchase of wholesale services from defendant.  The TSA included attachments describing the specific services that GlobalRock ordered from defendant and setting forth the rates and terms applicable to those services.  One of the service-specific attachments is entitled, "Attachment for Access Based Billing Carrier Origination Service."  This attachment governed the origination service (inbound toll-free service) that GlobalRock ordered from Verizon.  That origination service enabled plaintiff's customers to dial a toll-free number in order to be connected to plaintiff's calling card platform.  Other service-specific agreements entitled, "Attachment for Access Based Billing Carrier Termination Service" and "Attachment for Carrier

IP Termination Service", governed termination service (outbound service). Both types of termination service enabled plaintiff to pass calls from its calling card platform to Verizon for delivery to the local telephone company (or wireless carrier) service the number that the calling card user was trying to reach.

In 2003, the parties' predecessors-in-interest entered into a contract called the Digital Services Agreement ("DSA") that governed plaintiff's purchase of digital services from Verizon.

Information Digits

Telephone companies create networks and transmit a variety of information that enables the companies to complete telephone calls and then bill for them. Switches, which are computers that route calls through a telephone network, record the information so that it can later be used for billing purposes.

Call-signaling information is typically transmitted by Signaling System No. 7 ("SS7"). One field of data in an SS7 message is Information Digits. Information Digits are two-digit codes that provide information about the equipment used to originate the telephone call; for example, whether the call was placed from a land line, payphone or wireless phone. The local telephone company that originates the call generates the Information Digits that are placed in the SS7 message. If the originating carrier places an incorrect value in the Information Digits field of an SS7 message, that value is passed to the subsequent carriers.

GlobalRock uses an older signaling method called Multi-Frequency signaling ("MF"). MF signaling occurs in-band (on the same network that carries the telephone call). MF signaling uses different, and fewer, data fields than SS7 signaling. The MF signals that GlobalRock received from defendant had three fields of information: Automatic Number Identification ("ANI"), Dialed Number Identification Services ("DNIS") and Information Digits.

4

New York State Gross Tax Charges

Paragraph 5(b) of the TSA provides that GlobalRock "shall pay" for "any applicable federal, state or local use, excise, gross receipts, sales and privilege taxes, duties, fees or similar liabilities whether charged to or against [Verizon Business] or [GlobalRock] because of the Switched Services furnished to [GlobalRock,]" unless GlobalRock provides Verizon Business "with an appropriate exemption certificate."

Beginning in 2006, defendant began invoicing plaintiff for New York State gross receipts tax surcharges on certain services that defendant provided to plaintiff. Plaintiff disputed the application of the charges and refused to pay. On or around June 16, 2006, plaintiff recognized that it needed the assistance of a tax attorney to confirm whether the New York State gross receipts tax surcharges were properly applied to the services it received from defendant and whether an exemption certificate was required. On or around August 16, 2006, plaintiff was represented by independent tax counsel.

In April 2008, plaintiff and defendant entered into a settlement agreement resolving their dispute about the tax receipts charges. Plaintiff consulted with tax counsel before entering into the agreement. As part of the settlement agreement, plaintiff released all claims against defendant relating to the disputed tax charges. As consideration, defendant credited plaintiff $116,180.02 and plaintiff paid defendant $128,135.00.

Invoices and Demands for Payment

The TSA and DSA required plaintiff to pay all undisputed charges within thirty days of the date of each invoice. The TSA provided that, if plaintiff did not pay all undisputed charges on or before the due date, a late fee of 1.5% would apply. Both the TSA and DSA provided that if defendant denied plaintiff's disputes in writing, the disputed amounts would become due and the

contractual late fees would apply to those amounts.[2]

On October 1, 2009, defendant issued an invoice to plaintiff for services provided under the TSA during the month of September 2009 for account number 2100113660.  The invoice contained charges of $769,324.22.  Of these charges, $177,079.22 was for origination service.  Plaintiff did not pay any portion of the charges.  Plaintiff did not dispute any of the aforementioned invoice charges.  On October 1, 2009, defendant issued an invoice to plaintiff for services provided under the TSA during the month of September 2009 for account number 2100116744.  The invoice contained charges of $149,250.76.  Plaintiff did not pay any portion of the charges.  Plaintiff did not dispute any of the aforementioned invoice charges.  On October 1, 2009, defendant issued an invoice to plaintiff for services provided under the DSA with charges of $2,373.51.  Plaintiff did not pay any portion of the charges.  Plaintiff did not dispute any of the aforementioned invoice charges.

On November 1, 2009, defendant issued an invoice to plaintiff for services provided under the TSA for October 2009 for account number 2100113660. This invoice contained charges of $928,860.17.  Of these charges, $173,567.72 were for origination service.  Plaintiff did not pay any portion of the charges.   On November 1, 2009, defendant issued an invoice to plaintiff for services provided under the TSA for account number 2100116744 for October 2009.  The invoice contained charges of $158,162.26.  Plaintiff did not pay any portion of the charges. On November 1, 2009, defendant issued an invoice to plaintiff for services under the DSA with charges of $1,820.73.  Plaintiff did not pay any portion of the charges.

On November 2, 2009, defendant sent a letter to plaintiff requesting that plaintiff pay the past-due, undisputed balance of $1,423,897.88 on the invoices issued by defendant on September

---

[2] Plaintiff admits that the language in the TSA and DSA provide as such, however, plaintiff disputes that this was the actual practice between plaintiff and MCI.

1, 2009 and October 1, 2009.  The letter demanded payment of the undisputed portions of the two recent sets of invoices.  Defendant did not include any demand for payment on disputed amounts and did not include any amounts that were more than 90 days overdue.  Defendant notified plaintiff that if it did not pay the charges in question within five days, defendant would "terminate all telecommunications services currently being provided by Verizon Business and any of its affiliates, to [GlobalRock] on or after 12:00 Noon, CST, November 9, 2009".  On November 16, 2008, plaintiff filed the within lawsuit.

On December 1, 2009, defendant issued an invoice to plaintiff for services provided under the TSA for November 2009 for account number 2100113660.  The invoice contained charges for $518,924.58.  Of those charges, $53,320.44 was for origination service.  On December 1, 2009, defendant issued an invoice to plaintiff for services provided under the TSA for the month of November 2009 for account number 2100116744.  The invoice contained charges of $115,530.28.  Plaintiff did not pay any portion of the charges. On December 1, 2009, defendant issued an invoice to plaintiff for services under the DSA with charges of $2,226.10.  Plaintiff did not pay any portion of the charges.

On January 31, 2010, plaintiff filed a written dispute challenging $17,181.90 of the invoiced charges relating to the November 2009 invoice to plaintiff for services provided under the TSA for October 2009 for account number 2100113660.  On February 10, 2010, plaintiff received written notice that defendant denied the dispute.  On February 23, 2010, plaintiff filed a written dispute challenging a portion of the December 2009 invoice on account numbers 2100113660 and 2100116744.  Plaintiff disputed $4,336.41 in origination charges and $1,916.54 in termination service charges.  On March 8, 2010, plaintiff received written notice that defendant denied this dispute.

Verizon terminated all telecommunications services that it was providing to GlobalRock under the TSA and DSA after GlobalRock failed to pay the past-due, undisputed charges demanded in the November 2009 letter.  After Verizon terminated service to plaintiff, plaintiff continued providing its prepaid calling card services relying on other carriers, including Level 3 Communications, to provide the origination and termination services that plaintiff had previously purchased from defendant.

Amended Complaint

Plaintiff asserts eight causes of action against defendant alleging breach of contract, gross negligence, failure to negotiate in good faith and fraud.  Plaintiff also seeks an order declaring the settlement agreement unenforceable.  Specifically, plaintiff asserts a claim for damages as to payphone-specific Information Digits claiming that defendant delivered calls that originated from payphones but did not contain pay-phone specific Information Digits in the call signaling information.  Plaintiff argues that it was unable to apply a surcharge that it imposes on payphone-originated calls.[3]  Plaintiff also asserts a claim as to wireless-specific Information Damages but the parties dispute the measure of damages on that claim.  Plaintiff also claims that it sustained $423,340.87 in damages due to the fact that defendant improperly classified interstate calls as intrastate.  The damages represent the difference between the intrastate rate that plaintiff was charged and the interstate rate that plaintiff claims it should have been charged.  Plaintiff did not pay defendant the amount referenced above and has admitted that it is not seeking to recover that amount.  Plaintiff also asserts claims based upon incomplete calls but the parties dispute the relevant facts surrounding that issue.

Defendant filed an answer and asserted counterclaims for breach of contract.

_____

[3] Plaintiff also claims that it incurred additional damages including amounts paid in settlement of litigation to payphone providers and the costs associated with litigating those actions.

Procedural History

In February 2010, defendant filed a motion to dismiss portions of the amended complaint as it related to the New York State tax charges, and also sought dismissal of GlobalRock's fraud claims, alleging that the claims fail to satisfy the heightened pleading requirements of Rule 9(b). In November 2010, Chief Judge Gary L. Sharpe issued an Order denying defendant's motion. With respect to the tax charges claims, "GlobalRock alleged that it was fraudulently induced to enter into the agreement; that there was a lack of 'equal bargaining power' between the parties in negotiating the agreement; that the agreement was procured through economic duress; and that the agreement was unconscionable."   The Court held, "[w]hile Verizon offers admittedly compelling arguments in this regard, and while the counter-arguments asserted by GlobalRock will likely be insufficient to avoid summary judgment, the court permits the challenged portions of the amended complaint to survive at this juncture and denies Verizon's motion to dismiss as to this issue." (Dkt. No. 37).  With respect to the fraud claims, the Court found that the allegations were sufficiently particular to provide fair notice and denied that portion of the motion.

## DISCUSSION

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant moves for summary judgment and dismissal of plaintiff's amended complaint. In addition, defendant moves for summary judgment on the counterclaims and an award of $4,351,610.13 in damages.

**I.      Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## II.    Affidavits

In opposition to defendant's motion, plaintiff submitted affidavits from Ivan Danilov ("Danilov") and David Malfara ("Malfara").  Defendant argues that both affidavits are improper and should not be considered by the Court in the context of the motion for summary judgment.[4]

Local Rule 26.3 provides:

Production of Expert Witness Information

---

[4] Defendant filed a separate motion to exclude Malfara's reports and testimony (Dkt. No. 96).  As such, the Court will discuss defendant's objections to Malfara's affidavit *infra*.

> There shall be binding disclosure of the identity of expert witnesses. The parties shall make such disclosure, including a curriculum *vitae* and, unless waived by the other parties, service of the expert's written report pursuant to Fed. R. Civ. P. 26(a)(2)(B), before the completion of discovery in accordance with the deadlines contained in the Uniform Pretrial Scheduling Order or any other Court order. Failure to comply with these deadlines may result in the imposition of sanctions, including the preclusion of testimony, pursuant to Fed. R. Civ. P. 16(f).  If a party expects to call a treating physician as a witness, the party must identify the treating physician in accordance with the timetable provided in the Uniform Pretrial Scheduling Order or other Court order.

N.Y.N.D.L.R. 26.3.

Fed. R. Civ. P. 37(c)(1) provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless."  "The purpose of Rule 37(c)(1) is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y. 2004).  In assessing whether to preclude an expert's report, courts should consider: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).  "It [is] an exceedingly simple, perfunctory task to give notice of witnesses as required by Rule 26(a)(1)(A)(i) but one which was important to permit defendants to meet [the expert's] testimony." *Kullman v. New York*, No. 07-CV-716, 2009 WL 1562840, at *8 -9 (N.D.N.Y. May 20, 2009) (citing *Reilly v. Natwest Mkts. Group Inc*., 181 F.3d 253, 268–69 (2d Cir. 1999)).

On March 31, 2011, plaintiff served a Rule 26(a)(1) disclosure and included the names of possible witnesses: (1) Sleppin Stu, GlobalRock President; (2) Alexi Archinov, Consultant; (3) Bob Teeman, Telecom Switching, Inc.; and (4) Pete Golomb, EZ Call, Inc.  Plaintiff also stated:

> GlobalRock reserves the right to identify other individuals: at MCI and Verizon; at the New York State Department of Taxation and Finance; at Billing Concept; at other telecommunications carriers, including but not limited to those interconnecting with or delivering traffic to or from MCI; and at other entities who may also have discoverable information that GlobalRock may use to support its claims or defenses.

On June 14, 2012, United States Magistrate Judge Randolph F. Treece held a discovery hearing and issued an Order which stated, *inter alia*, that all discovery, other than expert discovery, had been completed.  With respect to expert discovery, the Court permitted the parties to conduct additional expert depositions and afforded the parties the opportunity to exchange additional expert reports. The Court reset the discovery deadline for August 31, 2012. (Dkt. No. 84).  On December 28, 2012, plaintiff filed opposition to defendant's summary judgment motion and included an affidavit from Ivan Danilov and an affidavit from David Malfara dated December 28, 2012. (Dkt. No. 101).

Defendant contends that plaintiff failed to identify Danilov as either a fact witness or expert witness during discovery and thus, his affidavit must be disregarded.  Plaintiff responded to the argument in a sur-reply and set forth several arguments in support of the affidavit including: (1) it became necessary to identify Danilov because plaintiff's expert, Alexi Archinov ("Archinov"), recently became unavailable having relocated to Russia; (2) that Danilov assisted Archinov in his data processing and bill review and relied upon the same information in preparing his calculations; (3) Danilov was only "asked to step in and perform additional data review" based upon defendant's billing records; and (4) Danilov's affidavit is direct rebuttal evidence permitted in opposition to the motion for summary judgment.  Plaintiff does not cite to any caselaw in support of these arguments.

Plaintiff attempts to justify the late disclosure, thereby conceding that defendant had no

notice that plaintiff intended to use Danilov as an expert witness until its receipt of plaintiff's opposition to the motion for summary judgment. While plaintiff offers several explanations for the failure to timely disclose, none qualify as "substantial justification." Plaintiff claims that Archinov moved to Russia. However, the record does not contain any affidavit from Archinov attesting to his unavailability. Indeed, plaintiff only vaguely states that Archinov "moved to Russia," but failed to disclose when he actually became unavailable and when plaintiff was first notified of his unavailability. Moreover, plaintiff asserts, without support, that Danilov assisted Archinov with his expert analysis. However, that assertion is not supported by the record as plaintiff has not cited to any portion of Archinov's testimony or report where Danilov's involvement is noted. Plaintiff's explanations for its failure to comply with the Court's order and Local Rules are inadequate.

Regardless of the explanation for the untimely disclosure, plaintiff's failure to disclose Danilov as a witness is not harmless. Plaintiff admits that Danilov was not previously disclosed and therefore, Danilov was never deposed. Defendant could not have anticipated Danilov's involvement. Other Call Management System (CMS) employees were deposed at length and did not mention Danilov. On December 21, 2011, Robert Teeman, President of CMS was deposed. Mr. Teeman testified regarding plaintiff's relationship with CMS, and stated that CMS was responsible for "scrubbing" bills from different carriers. He testified:

> Q.    If you could just elaborate more on what you mean by scrubbing.
> A.    When the bills come in, it's more of a forensic look at the way -- each carrier sends in bills in different formats. So kind of what it does is it checks out everybody's format and going over, matching it up with our call records and making sure everything jibes.
> Q.    And again, when you say our call records, you're referring to?
> A.     Whatever our switch records are.
> Q.     And you're referring to the switch records of Telecom Switching?
> A.    Telecom Switching.
> Q.    And GlobalRock?

>       A.      Well, GlobalRock is a customer of Telecom Switching
.

Mr. Teeman also testified about other CMS employees:

>       Q.      Does Call Management have any other employees?
>       A.      Yes.
>       Q.      Who are those employees?
>       A.      It's like four or five people.
>       Q.      Can you identify them by name and just each person's position?
>       A.      Well, a couple of them have been moved over in the last couple of months
>               from Telecom Switching just from a consolidation point of view.  It's Alex
>               Archinov. Mandy -- I'm gonna cannibalize her last name, she's Chinese -- Hu,
>               okay, Mae, again her last name I don't know. And Ina Ducoch (phonetic).
>       Q.      Are there any other employees of Call Management?
>       A.      I think that's it.

While plaintiff correctly notes that rebuttal evidence from an expert is acceptable on a

motion for summary judgment, that is not the situation presented herein.  With Danilov's

affidavit, plaintiff is seeking to introduce a new opinion from a previously unidentified expert.

Based upon the record, defendant will suffer prejudice if the Court accepts Danilov's affidavit in

opposition to the pending motion for summary judgment.  Accordingly, for the foregoing reasons,

for purposes of deciding the motion for summary judgment, this Court has disregarded Danilov's

affidavit.[5]  *See Prendergast v. Hobart Corp.,* No. 04-cv-5134, 2010 WL 3199699, at *5

(E.D.N.Y. Aug. 12, 2010); *see also Vona v. Schindler Elevator Corp. Mgmt.*, No. 05-CV-0131,

2009 WL 2152309, at *8 (W.D.N.Y. July 14, 2009) (counsel simply filed an expert affidavit in an

effort to defeat a motion for summary judgment nearly eight months after the deadline for expert

disclosure had passed).

---

[5] In the reply memorandum, defendant argues that plaintiff may not rely on Danilov's affidavit to defeat summary judgment.  One week later, defendant submitted a sur-reply in response to plaintiff's sur-reply.  (Dkt. No. 109).  For the first time, in the last sentence of the sur-sur reply, defendant states, "[t]he Court should not allow GlobalRock to rely on Danilov's testimony to oppose summary judgment or at trial".  At this time, the issue of whether Danilov should be precluded from testifying at trial is not before this Court.  The Court takes no position on that issue.  However, this Order shall not preclude defendant from raising this evidentiary issue in a motion *in limine* prior to trial.

### III.    Plaintiff's Claims

### A.    Breach of Contract and Gross Negligence (Counts 1, 2, 3 and 9)

Plaintiff alleges that defendant failed to provide accurate Information Digits on services provided to GlobalRock.  Plaintiff also alleges that defendant misclassified calls that were interstate as intrastate and that defendant terminated calls that were incomplete.  Plaintiff's allegations are the basis for the following causes of action: breach of contract (Counts 1 and 8), gross negligence and failure to comply with federal requirements (Count 2), and gross negligence (Counts 3 and 9).

Defendant has moved for summary judgment and dismissal of the above referenced counts.  Defendant claims that there is no evidence that defendant violated the contract or federal law.  Defendant argues that consequential damages are barred by the parties' contract.  In addition, defendant contends that there is no evidence that plaintiff sustained any damages.

The Court has thoroughly reviewed the moving papers and plaintiff's opposition.  The Court is compelled to note that neither party engaged in any meaningful discussion of the elements of plaintiff's causes of action.  Instead, both parties have chosen to present the Court with a voluminous factual record including conflicting deposition testimony and expert opinions.  The parties' positions rest on arguments that are based entirely upon the facts with no citations to relevant state or federal law.  The extrinsic evidence and fact-intensive arguments set forth present a myriad of factual issues that are not properly considered on a motion for summary judgment.  Defendant has failed to establish the absence of a genuine issue of material fact as to any of the issues raised in the aforementioned counts.  Accordingly, defendant's motion for summary judgment, on this basis, is denied.

### B.    Failure to Negotiate in Good Faith

15

In Count 4, plaintiff alleges that defendant refused to negotiate in good faith resulting in a breach of contract.  Defendant moves to dismiss this cause of action arguing, "GlobalRock cannot cite any admissible evidence showing that Verizon Business ever acknowledged the legitimacy of a dispute and then failed to provide appropriate relief."  Moreover, defendant contends that there is no evidence that defendant ever promised discounts or billing changes.

For the reasons set forth in IIIA, this portion of defendant's motion is denied.

## C. New York State Taxes and Settlement Agreement

Plaintiff asserts a cause of action for breach of contract in the provision of interstate and intrastate telephone services based upon defendant assessing New York State taxes, including a gross revenue and/or telecommunications excise tax, on services provided to plaintiff (Counts 1 and 8).  Defendant claims that these causes of action are barred by the parties' 2008 settlement and release agreement. Plaintiff argues that the agreement is unenforceable based upon fraudulent inducement, duress and unconscionability (Count 7).  Pursuant to Section 6(L) of the settlement and release agreement, the agreement is governed by Oklahoma law.[6]

### 1. Fraudulent Inducement

Plaintiff alleges:

> On or about February 16, 2007, MCI sent a letter to GlobalRock which deliberately, knowingly and fraudulently asserted that New York State tax law required MCI to assess and collect New York State taxes on telecommunications services provided to GlobalRock. [. . .] GlobalRock relied upon such false representations from MCI and executed a "Settlement and Release Agreement" dated April 11, 2008, covering tax liabilities through MCI's invoice of October 1, 2007, under which GlobalRock made payment to MCI of a large sum of money, and release any claim to return of such money.
>
> In assessing and collecting taxes from GlobalRock, MCI possessed

---

[6] The parties do not dispute this fact.

superior knowledge of the administration of telecommunications taxes, and as a result MCI knew what taxes should properly be imposed on services provided to GlobalRock.  GlobalRock was not a "sophisticated party" with respect to the complex telecommunications taxes MCI claimed were applicable, and did not have "equal bargaining power" with respect to provisions governing collection and payment of taxes.  MCI held a fiduciary relationship to GlobalRock, pursuant to which it had a fiduciary duty to accurately inform GlobalRock of taxes actually owed to taxing authorities, and to collect only such taxes as were actually owed and no others.  MCI breached this fiduciary duty to GlobalRock by fraudulently issuing bills demanding payment of knowingly incorrect tax amounts; fraudulently asserting the taxes billed were accurate and payable; forcing GlobalRock to execute the Settlement and Release Agreement; and forcing GlobalRock to pay to it significant sums of money pursuant to the Settlement and Release Agreement.

Am. Cmplt. at ¶ 62, 64.

Defendant moves for summary judgment arguing that plaintiff improperly relies upon misrepresentations of law to void the agreement.  Plaintiff argues that the allegations are based upon misrepresentations of law and fact.  With respect to misrepresentations of law, the parties agree that, "[g]enerally speaking, a misrepresentation of law affords no grounds of redress or relief on the theory that all men are supposed to know the law."  *Nesbitt v. Home Fed. Sav. & Loan Ass'n*, 440 P.2d 738, 743 (Okl. 1968); *see also First Nat. Bank & Trust Co. of Muskogee v. Muskogee Discount House of Muskogee*, 382 P.2d 137, 139 (Okla. 1963) ("[t]he general rule is well settled that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law").  However, as plaintiff notes, there is an exception where, "one has superior means of information, professes a knowledge of the law, and thereby obtains an unconscionable advantage of another who is ignorant and has not been in [a] situation to become informed, the injured party is entitled to relief as well as if the representation had been made concerning a matter of fact."  *Nesbitt*, 440 P.2d at 743.

Here, plaintiff alleges that a fiduciary duty existed between plaintiff and defendant such

that plaintiff, "relied upon defendant's vastly superior knowledge of the administration of telecommunication taxes." Oklahoma courts have not given a precise definition of a fiduciary relationship, but have held that the relationship arises whenever "there is confidence reposed on one side and resulting domination and influence on the other. . . . [The] relationship springs from an attitude of trust and confidence and is based on some form of agreement, either expressed or implied, from which it can be said the minds have been met to create a mutual obligation. *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 729 (10th Cir. 1991) (internal quotations and citations omitted). "Another Oklahoma court described the relationship as occurring 'when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible.'" *Id.* (a franchise agreement cannot alone establish a fiduciary relationship). "Thus, Oklahoma law would recognize a fiduciary duty arising out of a commercial contract if the transaction involved facts and circumstances indicative of the imposition of trust and confidence, rather than facts and circumstances indicative of an arms length commercial contract." *Quinlan v. Koch Oil Co.*, 25 F.3d 936, 942 (10th Cir. 1994) (quoting *Devery Implement Co.*, 944 F.2d at 730).

In *Devery*, the Tenth Circuit held:

> Nothing in the record indicates that the circumstances of this relationship would allow a reasonable and prudent person to repose trust and confidence in the defendants to the degree necessary to establish a fiduciary relationship under Oklahoma law. The record does contain evidence of concerted action in marketing, training, and financing; however, none of this evidence is significantly probative of the substitution of the will of defendants for that of Devery. As we have stated, "[m]ere concert of action, without more, does not establish a fiducial relationship."

*Devery*, 944 F.2d at 732.

18

Here, the evidence in the record demonstrates that the plaintiff did not rely upon defendant's trust or confidence.  Paragraph 6(G) of the Agreement provides:

> The Parties acknowledge that they have consulted with legal counsel of their choosing before entering into this Settlement Agreement, that they have read this Agreement and know its contents, and the context hereof, and that they execute this Settlement Agreement freely and voluntarily.

In August 2006, nearly two years prior to the execution of the Agreement, plaintiff retained counsel to provide legal advice on the issues raised in the Agreement.  Plaintiff has failed to present any evidence that it placed a degree of trust in defendant nor does the evidence demonstrate that defendant had any greater knowledge of and access to information needed by plaintiff.  The Settlement Agreement was a transaction between two business entities, represented by counsel, devoid of any intimidation, influence or dominance.  *See First Nat. Bank*, 382 P.2d at 139 (the parties were successful business men of considerable experience, accustomed to buying and selling business properties, and familiar with such things as leases, deeds and contracts, who read and submitted the contract to an attorney before signing).  Indeed, Verizon was not the only carrier that plaintiff purchased services from.  After Verizon terminated service to GlobalRock, GlobalRock continued to provide its customers with services by relying on other carriers.  *See* Statement of Material Facts at ¶ 88; *see also Devery*, 944 F.2d at 732 (the record revealed that the defendant was not the plaintiff's primary line of tractors, but one of several short-line products which plaintiff sold and this fact alone would make it difficult for a reasonable trier of fact to conclude that Devery was forced by virtue of its weak position to allow a substitution of defendants will for its own).  The Court finds no reasonable inference for any conclusion other than that the parties bargained at arms length without giving rise to fiduciary duties.  *See Leisure Hospitality Inc. v. Hunt Prop. Inc.*, No. 09-CV-272, 2011 WL 2160498 at *10 (N.D. Okla. June 1,

2011) (the allegations, viewed in conjunction with the Agreement, do not support a conclusion that, on the defendants' side, there was "overmastering influence" and on the plaintiff's, "weakness, dependence or trust, justifiably reposed.").  Indeed, plaintiff has not cited to a single case where the Court has found a fiduciary relationship to exist in an analogous situation.

While the cases cited by plaintiff in support of the fiduciary claim provide the proper definition of "fiduciary relationship" under Oklahoma law, the cases are factually distinguishable from the case at hand.  *See Lowrence v. Patton*, 710 P.2d 108, 111 (Okla. 1985) (the fiduciary relationship was created by statute as custody of the decedent's funds were based upon an implied agreement between the Center and the decedent wherein the Center became obligated to safely hold his funds and disburse them at the direction of the decedent or his lawfully appointed representative); *see also In re Estate of Beal*, 769 P.2d 150, 155 (Okla. 1989) (discussing the existence of a confidential relationship in the context of will preparation where beneficiary was decedent's friend and cared for decedent's personal and medical needs).

Plaintiff also argues that the false representations were not only misrepresentations of law but also of fact.  Misrepresentations which will invalidate a contract must be representations that were material to the contract or transaction at the time they were made and the misrepresented facts must be facts of which the victim is ignorant, and which a person of ordinary sagacity and diligence would have acquired no knowledge.  *James Talcott, Inc. v. Finley*, 389 P.2d 988, 992-93 (Okla. 1964)

Plaintiff relies upon representations made in a February 16, 2007 letter from defendant's "Senior Tax Counsel."  Despite plaintiff's reference to the letter as "Ex. D-36," the record before the Court does not contain that letter.  Moreover, even assuming that the letter was part of the record, it is not in admissible evidentiary form because the letter has not been properly

authenticated through testimony or an affidavit from its author.  Further, even assuming the letter

was in proper form, the letter predates the execution of the Settlement Agreement by over one

year.  *See First Nat'l Bank*, 382 P.2d at 139 (the parties did not sign the lease until several days

after the allegedly false representations of the trust officer was made).  Plaintiff has not

established that the letter contained material misrepresentations that plaintiff relied upon.  As for

the remaining allegations of misrepresentations of fact, the Court finds those equally unavailing,

overly broad, vague and conclusory.

Accordingly, the Court will not void the Settlement Agreement based upon allegations of

fraudulent inducement.

## 2.    Duress

Plaintiff also alleges that GlobalRock signed the Settlement and Release Agreement, "as a

result of duress, including the threat by MCI to require payment of the full amount of taxes" and

the threat of "forthwith terminat[ion] [of] all telecom services to GlobalRock."  Am. Cmplt. at ¶

65.  Moreover, plaintiff alleges that it was forced to sign the agreement under the threat of

"economic duress."  *Id*. at ¶ 66.  Plaintiff claims that defendant's employees "repeatedly

threatened to disconnect service to GlobalRock" effectively "holding a gun to [plaintiff's] head to

sign the agreement."

In Oklahoma, economic duress allows a party to avoid a contract that it has entered if a

"wrongful act [of the other party was] sufficiently coercive to cause a reasonably prudent person

faced with no reasonable alternative to succumb to the perpetrator's pressure."  *Strickland Tower

Maint., Inc. v. AT & T Commc'n, Inc*., 128 F.3d 1422, 1426 (10th Cir. 1997) (citation omitted).

To avoid a contract on grounds of economic duress, Oklahoma law requires a litigant to show that

the settlement was the result of a wrongful or unlawful act which (1) was initiated by the coercing

party, (2) was committed with knowledge on the part of the coercing party of the impact it would

have, (3) was made for the purpose of, and reasonably adequate to secure coercion over the other,

and (4) resulted in obtaining undue advantage over the other. *McKissick v. Yuen*,  618 F.3d 1177,

1194-95 (10th Cir. 2010) (citations omitted).  The act or acts complained of must have deprived

the coerced party of its free will, leaving no adequate legal remedy nor reasonable alternative

available. *Id*. (citations omitted).  "In this respect it is not enough that the alleged victim merely

show, for example: (1) its reluctance to settle, (2) its financial embarrassment, or (3) its business

necessities." *Id*. (citations omitted); *see also Strickland*, 128 F.3d at 1426 (a litigant cannot make

out a claim of economic duress by alleging merely that the opposing party took advantage of her

weak negotiating position or because of "business necessities").  "[W]hether the alleged facts are

sufficient to constitute duress is a question of law." *Centric Corp. v. Morrison-Knudsen Co.*, 731

P.2d 411, 417 (Okla. 1986) (whether the alleged threat is sufficient to constitute duress is a

question of law and if the threat satisfies the elements of duress, then the actual existence of

duress is a question of fact for the jury).  "[I]t is a general rule that a transaction cannot be held to

have been induced by duress . . . where the party had and took an opportunity for reflection and

for making up his mind, and where he consulted with others and had the benefit of their advice,

especially where he was advised by his counsel." *Palmer v. U.S. W. Commc'ns, Inc*., 36 F. App'x

644, 648 (10th Cir. 2002).

Plaintiff attempts to distinguish the facts at hand from the facts in *Strickland* arguing that

in this case, "the party engaging in economic duress was not the buyer, but rather the

monopolistic seller of regulated telecommunications services, were the buyer, the oppressed

party, would lose the essential input to its own product and be unable to continue in business."

The Court is not persuaded by plaintiff's conclusory allegations which lack citations to any

relevant or admissible portion of the record. *Cf. Kal Drilling, Inc. v. Buray Energy Int'l, LLC,* No. CIV-06-0619-F, 2007WL 1462435, at *1 -2 (W.D. Okla. May 17, 2007) (the party seeking to void the contract identified evidence sufficient to support a jury finding of duress with regard to the signing of a drilling contract including affidavit testimony describing allegedly untrue statements regarding the availability of equipment that was withheld; unsuccessful efforts to find substitute equipment; and no other reasonable alternatives existed).  In opposition to defendant's motion, plaintiff has failed to produce any evidence demonstrating that plaintiff signed the Agreement because it had no reasonable alternative.  Plaintiff has not produced any evidence regarding the availability or unavailability of other service or detailed any efforts made to secure alternate service as a result of the negotiations regarding New York taxes.

Indeed, in paragraph 88 of the Statement of Material Facts, plaintiff admits that after Verizon terminated service, Global Rock continued to operate relying on other carriers to provide the origination and termination services that plaintiff previously purchased from Verizon. *See* Statement of Material Facts ¶ 88.

Given the timetable, plaintiff clearly had sufficient time to ponder the agreement and opportunities to explore other options.  By plaintiff's own admission, it received a letter in February 2007 from defendant's tax counsel regarding the tax issues.  In August 2006, plaintiff retained tax counsel.  Nearly a year and half later, plaintiff executed the Settlement Agreement.

Plaintiff has not met its burden of establishing the elements necessary to support a claim of economic duress.  *See Strickland*, 128 F.3d at 1427 (the fact that STM's business dependence on AT&T drove STM's decisions could not support a claim of economic duress).  Accordingly, the Court will not void the Settlement Agreement based upon duress.

### 3.     Unconsciability

Plaintiff claims that because the taxes were not actually owed, defendant was unjustly enriched and thus, the agreement was unconscionable and should be deemed void and unenforceable.  Am. Cmplt. at ¶ 67, 69.

"An unconscionable contract is one which no person in his senses, not under delusion would make, on the one hand, and which no fair and honest man would accept on the other." *Barnes v. Helfenbein*, 548 P.2d 1014 (Okla. 1976).   The *Barnes* Court held:

> [A]n unconscionable contract is one in which no person in his senses, not under delusion would make, on the one hand, and which no fair and honest man would accept on the other. The basic test of unconscionability of a contract is whether under the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties. Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other party.

*Id*. at 1020.  "The question of unconscionability is one of law for the Court to decide."  *Stoll v. Chong Lor Xiong*, 241 P.3d 301, 305 (Okla. 2010) (citations omitted).

In opposition to defendant's motion on this issue, plaintiff alleges, "GR has shown the settlement was unconscionable."  This conclusory assertion is not supported by any citation to the record or supported by any admissible evidence.  Plaintiff cites to the relevant Oklahoma caselaw regarding the standard for unconscionability but makes no argument in support of this claim.  As stated previously, the Settlement Agreement was negotiated by two corporations, represented by counsel.  There is no evidence that it was forced upon plaintiff or that defendant was the stronger party.  When there is "no evidence, [...] of unequal bargaining power, nor that the terms were excessive or unreasonable at the time entered into, and [...]  no penalty clauses, hidden clauses, or incomprehensible clauses," the contract will not be found to be unconscionable.  *See Kennedy &*

*Mitchell, Inc. v. Internorth, Inc.*, Nos. 86-C-404, 86-C-609, 1989 WL 433016, at *18 (N.D. Okla. Apr. 10, 1989). Accordingly, the Court will not void the Settlement Agreement for this reason.

Having reviewed the record in its entirety, the Court finds, as a matter of law, the plaintiff's cause of action for an order declaring the Settlement and Release Agreement void and unenforceable is meritless. Consequently, Count 7 of the amended complaint is dismissed. Based upon the record and Settlement Agreement, defendant's motion for summary judgment and dismissal of plaintiff's breach of contract and negligence claims based upon the tax issues is granted.

**D.      Fraud**

Defendant moves for summary judgment and dismissal of plaintiff's allegations of fraud. The elements of actual fraud are: "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment." *Lampton Welding Supply Co., Inc. v. Stobaugh*, No. 11-CV-319, 2012 WL 5398790, at *15 (N.D. Okla. Nov. 2, 2012) (citation omitted). "Fraud is never presumed and each of its elements must be proved by clear and convincing evidence." *Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009). "[A] complaint alleging fraud [must] 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (citation omitted).

Here, defendant alleges that plaintiff cannot establish the elements of fraud to sustain a cause of action for fraudulent inducement as it relates to the TSA contract or continued fraudulent misrepresentations after the contract was executed. As to fraudulent inducement in the execution of the TSA, plaintiff sets forth no argument in support of that theory and therefore, the Court

25

deems that abandoned.

With regard to fraudulent misrepresentations, plaintiff claims that "GR has set forth numerous facts which a jury could deem fraudulent conduct." *See* Dkt. No. 101, p. 24.  Plaintiff sets forth a plethora of allegations relating to alleged fraudulent conduct including, but not limited to: "deliberately misleading GR into believing that MCI was using CPN"; "misleading GR into believing that MCI was complying with FCC Orders and industry practices; "deliberately refusing to address plaintiff's complaints of fraud".  Defendants opposition consists of conclusory allegations without citations to the record or any other admissible evidence. "[B]road-brush arguments" in opposition to defendant's motion that fail to identify precisely what material misstatement or omission constituted the alleged fraud, are insufficient to avoid summary judgment.  *See Parks v. AT & T Mobility, LLC*, No. CIV-09-212-D, 2012 WL 4382194, at *8 (W.D. Okla. Sept. 25, 2012).  "[K]nowledge is an essential element of a fraudulent representation claim."  *Southcrest, L.L.C. v. Bovis Lend Lease, Inc.*, No. 10-CV-0362, 2011 WL 3881495, at *4 (N.D. Okla. Sept. 2, 2011) (citations omitted).  While plaintiff alleges that defendant was "deliberate" and "misleading," plaintiff has failed to demonstrate, with competent evidence, that defendant knew of the falsity of its statements or that it was reckless in making such statements. *See id.* (allegations that statements are false are conclusory statements of fraud and insufficient). Plaintiff has not demonstrated, with admissible evidence, that defendant possessed the requisite state of mind required for a fraud claim.  Equally fatal to plaintiff's claim is the fact that the allegations are unsupported by any facts concerning "the time or place of the false representations, the identity of the person making the false statements, or to whom the statements were made."  *See Elliot Plaza Pharmacy, LLC v. Aetna U.S. Healthcare, Inc.*, No. 06-CV-623, 2009 WL 702837, at *4 (N.D. Okla. Mar. 16, 2009).  Plaintiff also attempts to assert a cause of

action for fraud based upon defendant's "fraudulently billing gross revenue taxes and misrepresenting tax law." As discussed *supra*, defendant is entitled to summary judgment and dismissal of any and all causes of action based upon tax issues.

Upon a review of the record, the Court finds that plaintiff has failed to sustain the burden of proof of demonstrating that genuine issues of fact exist with respect to all claims of fraud. Accordingly, summary judgment and dismissal is warranted.

## IV.    Defendant's Counterclaims

Defendant seeks summary judgment on its counterclaim which contains two causes of action for breach of contract against plaintiff. Defendant moves for an award of damages in the amount of $4,351.610.03. For the reasons set forth in Part IIIA, defendant's motion is denied.

### DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERTS

In addition to the motions for summary judgment, defendant filed two separate motions seeking to preclude plaintiff's expert witnesses from testifying at the time of trial.

## I.    Stu Sleppin

In the March 2011 Rule 26(a)(1) disclosure, plaintiff identified Stu Sleppin as a potential witness at trial to testify on "all areas of disputes and damages". On December 16, 2011, plaintiff served a Disclosure of Expert Testimony designating Mr. Sleppin as an expert and summarized his testimony as follows:

> Mr. Sleppin will present evidence on the practices of MCI in assessing various taxes and surcharges on services provided by MCI to GlobalRock; the sudden reversal of MCI practices in 2006, without prior notice to GlobalRock, regarding documentation demanded by MCI as a pre-requisite to extending the sale for resale exemption for New York State gross revenue/excise taxes; GlobalRock's objections to payment of those taxes to MCI; MCI's conduct in refusing to grant such sale for resale exemption to GlobalRock; MCI's threats to terminate all service to GlobalRock unless GlobalRock paid amounts for gross revenue taxes demanded by MCI; GlobalRock's attempt to

27

resolve the matter with MCI; MCI's willful misrepresentations and
fraudulent conduct to GlobalRock with respect to the requirements of
New York State tax law; the superior bargaining position of MCI
compared to GlobalRock; the facts and circumstances which caused
GlobalRock, under duress, to enter into the "Settlement and Release
Agreement" dated April 1, 2008 (the Tax Settlement); GlobalRock's
reliance on MCI's superior knowledge regarding tax matters; MCI's
fiduciary duty to GlobalRock regarding tax collections, and its breach
of that duty; and the damages suffered by GlobalRock as a result of
entering into the Tax Settlement.

Defendant argues that Sleppin is not qualified to testify as an expert and further, that his

testimony involves legal conclusions that are the province of the Court.  Based upon the

substance of Sleppin's proposed testimony, the Court need not address these issues.        As

discussed in Part IIIC, any and all claims including but not limited to breach of contract, gross

negligence or fraud relating to gross revenue taxes are dismissed.  Accordingly, plaintiff is

precluded from offering any testimony from Mr. Sleppin on any such tax issues.  Moreover, as

discussed in Part IIIC, plaintiff's cause of action seeking a declaration that the Settlement

Agreement is void and unenforceable is dismissed.  Thus, Mr. Sleppin will be precluded from

offering any testimony regarding the "lawfulness of defendant's conduct in negotiating" the

Agreement.  Any other motions regarding the admissibility of Mr. Sleppin's testimony shall be

raised in timely motions *in limine* prior to trial.

## II.    David Malfara

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence.  That Rule provides as follows:

If scientific, technical, or other specialized knowledge will assist the
trier of fact to understand the evidence or to determine a fact in issue,
a witness qualified as an expert by knowledge, skill, experience,
training, or education, may testify thereto in the form of an opinion or
otherwise, if (1) the testimony is based upon sufficient facts or data,
(2) the testimony is the product of reliable principles and methods, and
(3) the witness has applied the principles and methods reliably to the

facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 597). The rule set forth in *Daubert* applies to scientific knowledge, as well as technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265 (internal alterations, quotations, and citations omitted). The court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations

based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Id.* (quotation and other citation omitted).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini v. 71st Lexington Corp.*, No. 07Civ.701, 2009 WL 413608, at *5 (S.D.N.Y. Feb. 13, 2009) (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; accord *Ruggiero*

*v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).[7]  Furthermore, "it is critical that an

expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.  Of course, "the district

court must focus on the principles and methodology employed by the expert, without regard to the

conclusions the expert has reached or the district court's belief as to the correctness of those

conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595).  Nevertheless, "conclusions and

methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

146 (1997).  Accordingly, "[a] court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered." *Id.* at 146.

### A.    Sufficient Data and Reliable Methods

Defendant argues that the Court should preclude Malfara from offering any testimony as

to the accuracy, reliability or integrity of the parties' CDRs (call detail records), incomplete calls

and opinions on plaintiff's Information Digits claim because the opinions are not based on

sufficient facts or data and not the product of reliable principles or methods.  The law is

well-settled that only serious flaws in an expert's reasoning or methodology will warrant

exclusion. *Id.* (citing *Amorgianos*, 303 F.3d at 267).  "Although expert testimony should be

excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic

and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison,

other contentions that the assumptions are unfounded go to the weight, not the admissibility, of

---

[7] *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that expert
testimony that was speculative and unreliable was properly not considered by the district court on summary
judgment); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 416-17 (W.D.N.Y. 2005) (noting that "[a]n
otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative
techniques or cannot explain the technical basis for his opinion"); *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d
875, 887-89 (E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions for
summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R. Evid. 702 and the
principles articulated in *Daubert* and its progeny," given that the expert (1) qualified his opinions, (2) failed to support
his opinions with any methodology which the court could analyze, and (3) rested his opinions "upon nothing more
than subjective belief and unsupported speculation").

the testimony." *Cohalan v. Genie Indus., Inc.,* No. 10 Civ. 2415, 2013 WL 829150, *5 (S.D.N.Y. Mar. 1, 2013) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Here, the court is presently satisfied that Malfara's opinions are the product of reliable principles and methods, and the result of a reliable application of these principles to the facts. *See* Fed. R. Evid. 702; *see also Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005). Malfara's report and affidavit rest on a sufficiently reliable foundation and are relevant to the issues presented. *See Amorgianos*, 303 F.3d at 265 (citation omitted); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995) (holding that the Supreme Court in *Daubert* "expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, ... and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable" (quotation omitted)).  While Malfara's opinion may not be grounded in "a plethora of hard facts, data, studies, and scientific literature," that is not a basis to exclude. *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 368 -69 (S.D.N.Y. 2003).  There is no evidence that Malfara's opinions "approach the outer boundaries of traditional scientific and technological knowledge" or are based on novel scientific evidence. *See id.*; *see also Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 228 (N.D.N.Y. 1994) (the expert's opinions are grounded in the results of his investigation, observations, experience, calculations, examination of accident reports, legal documents, medical records, medical images, owner's manuals, comparable Honda Civics, an inspection of the accident site, accident vehicle, transcripts of witness depositions, reports from defendants' liability experts, numerous photos of the accident scene, and police and medical reports).  The fact that Malfara, or any expert offered herein, may have neglected to perform some "essential" tests will go to the weight of his testimony, not its admissibility. *See Lappe*, 857 F. Supp. at 228.

While many of defendants contentions are sensible, they simply go to the weight of Malfara's testimony and do not provide a basis for exclusion. *See Demar v. D.L. Peterson Trust*, No. 1:05-cv-0103, 2006 WL 2987314, *5 (N.D.N.Y. Oct. 13, 2006) (permitting the testimony of the expert regarding the effect of seatbelt use to challenge and discredit the defendant's expert and the methodologies he used in reaching his conclusions). Defendant has raised flaws in Malfara's opinions, but "given that there is sufficient indicia of reliability" to allow admission of his testimony, "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Atl. Specialty Ins. Co. v. Gold Coast Dev., Inc.*, No. 05-CV-4863, 2008 WL 974411, at *9 (E.D.N.Y. Apr. 8, 2008) (citing *Daubert*, 509 U.S. at 596 (citations and quotations omitted)). Accordingly, the Court denies defendant's motion to exclude Malfara's testimony based upon this argument.

### B.   Legal Opinions

It is well established in this Circuit that expert testimony cannot "usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 181 (N.D.N.Y. 2002) (citing *U.S. v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992) (an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court). "Accordingly, although an expert may give his [or her] opinion on an issue of fact that the jury will eventually decide, 'he [or she] may not give testimony stating ultimate legal conclusions based on those facts.'" *Id.* (citation omitted). "[Expert witness] statements embodying legal conclusions exceed[ ] the permissible scope of opinion testimony under the Federal Rules of

Evidence." *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005).  Courts within this Circuit have not hesitated to preclude expert reports and testimony that "embod[ied] legal conclusions [and] exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence." *Ebbert v. Nassau County,* No. CV 05-5445, 2008 WL 4443238, *12-13  (E.D.N.Y. Sept. 26, 2008) (citing *U.S. v. Scop*, 846 F.2d 135, 138-40 (2nd Cir. 1988)) (finding that an expert witness's testimony that defendants engaged in a "manipulative and fraudulent scheme" within the meaning of federal securities laws constituted "legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading"), *modified on other grounds*, 856 F.2d 5 (2d Cir. 1988)).

Experts should not testify on the meaning of words in a statute or regulation as that decision is one of law which must be made by the court.  *Contini by Contini v. Hyundai Motor Co.*, 876 F. Supp. 540, 542 (S.D.N.Y. 1995) (experts should not testify as to whether the subject Hyundai violated or complied with Federal Motor Vehicle Safety Standards).  In *S.E.C. v. Badian,* 822 F. Supp. 2d 352, 357 -358 (S.D.N.Y. 2011), the SEC alleged that the defendants violated various SEC rules.  The defendant's expert report contained the following opinion:

> The SEC alleges that certain of the defendants violated various SEC rules . . . These rules, however, apply to regulated broker-dealers and their associated persons, not to Badian. I have carefully studied the SEC's complaint in this manner and the materials available to me, and I have not found any evidence whatsoever that Badian violated any SEC short-selling rule.

The plaintiff moved to strike the expert opinion.  The court found that the proposed testimony was replete with inadmissible generalized statements of law, legal conclusions and conclusory statements regarding the defendant's motivations, such as short selling.  Moreover, the court held that the expert's conclusion that the defendant complied with the applicable SEC rules was not admissible.

Similarly, an expert may not offer an opinion as to whether a parties' actions amount to gross negligence.  *See In re WorldCom, Inc. Secs. Litig*., 352 F.Supp.2d 472, 500 n.34 (S.D.N.Y. 2005) (noting that an expert's failure to opine that a defendant's actions were "reckless" accords with the prohibition on testimony concerning legal conclusions); *see also TC Sys. Inc*., 213 F. Supp. 2d at 182 (the expert's opinion of FCC rulings and regulations impermissibly usurped the role of the trial judge in determining the relevant law); *Atl. Specialty Ins. Co.*, 2008 WL 974411, at *9; *see also In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (the expert's opinion that conduct with respect to clinical trial data potentially constituted "negligence" or "something more serious" was excluded because it impermissibly embraced a legal conclusion).

In this matter, defendant claims that Malfara's opinions regarding Information Digits, the jurisdictional classification of calls and incomplete calls contain impermissible legal opinions. Defendant cites to "exemplary" portions of Malfara's December 14, 2011 report, but defendant has not presented the Court with specific objections or identified the specific opinions defendant seeks to strike.  The Court has reviewed Malfara's entire report and finds that, in several areas, Malfara expresses improper legal conclusions relating to breach of contract, gross negligence, violations of FCC rules and fraud.  Specifically, Malfara opines that defendant "cover[ed] up the [ ] fraud".  *See* Malfara Rep. at p. 19.  Malfara also concluded that defendant violated the FCC rules and the Agreement with respect to missing or improper Information Digits and jurisdictional classification.  *Id*. at p. 22, 25.  Moreover, Malfara opined that defendant was grossly negligent and engaged in willful misconduct in relation to the Information Digits claim and concluded that defendant's failure to respond to plaintiff's complaints was "tantamount to fraud itself; and is certainly in violation of every conceivable industry practice, related FCC rule, applicable federal

law and applicable contractual obligation, this expert can think of." *Id*. at p. 26-30.  Finally, with respect to charges for non-complete calls, Malfara opines that defendant's conduct was "gross negligence" and fraudulent.  *Id*. at p. 34.

At the time of trial, the Court will not permit Malfara to express these conclusions.  Any opinions related to fraud are irrelevant and improper based upon this Court's analysis in Part IIID. Malfara's opinions regarding violations of FCC rules, the TSA and/or DSA agreement and gross negligence are equally improper.  At the time of trial, Malfara will be permitted to testify however, he shall be precluded from offering any opinions that are tantamount to legal conclusions.  *See Scop*, 846 F.2d at 139-40, *modified*, 856 F.2d 5 (2d. Cir. 1988) (reversed conviction based on improper expert testimony where witness tracked exact language of securities statutes and regulations which the defendant had allegedly violated and used judicially defined terms such as "manipulation," "scheme to defraud" and "fraud" in opining on the defendant's conduct).

For these reasons, the motion to preclude Malfara entirely from testifying at trial, is denied.  Malfara will be permitted to testify at trial and offer his opinion, subject to cross examination.  However, portions of Malfara's report contain inadmissible legal conclusions.  In order for the non-violative portions of Malfara's testimony to be admissible at trial, it must be in compliance with the provisions of this Memorandum and Order to remove the impermissible legal analysis and conclusions as outlined here.  *See Ebbert*, 2008 WL 4443238, at *13.

### C.    Malfara's Affidavit in Opposition to Summary Judgment

While this issue is essentially moot based upon the Court's conclusions regarding issues of fact, for completeness, the Court will address this contention.  Defendant argues that Mr. Malfara's affidavit must be disregarded because it is a "third bite at the apple."  Plaintiff did not

respond to this argument.  "Pursuant to Rule 26 of the Federal Rules of Civil Procedure, courts will not admit supplemental expert evidence following the close of discovery when it 'expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report,' as doing so 'would eviscerate the purpose of the expert disclosure rules.'" *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (citation and quotations omitted).  "[T]o the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery." *Id.* (citations omitted). "Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report.... The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Harkabi v. SanDisk Corp.*, No. 08 Civ. 8203, 2012 WL 2574717, at *4 (S.D.N.Y. June 20, 2012) (citations omitted).

On this issue, defendant does not identify what portions of Malfara's affidavit are "new" or beyond the scope of his Rule 26 report.  Defendant only sets forth the conclusory statement that defendant "would be unfairly prejudiced".  *See Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Cv. 1253, 2010 WL 2674584, at *7 n.4 (S.D.N.Y. July 6, 2010) (allowing affidavits from plaintiff's experts "submitted . . . in opposition to summary judgment" because affidavits supported experts' initial positions); *see also Commercial Data Servers, Inc. v. Int'l Bus. Mach. Corp.*, 262 F. Supp. 2d 50, 61 (S.D.N.Y. 2003) (permitting expert affidavit on summary judgment motion where the affidavit was "substantially similar" to expert report).  Without any analysis regarding how or why defendant is prejudiced by the rebuttal affidavit, the Court is constrained to find that Malfara's affidavit should be stricken from the record on this motion for summary judgment.

# CONCLUSION

**It is hereby**

**ORDERED**, that defendant's motion for summary judgment and dismissal of plaintiff's complaint in its entirety (Dkt. No. 95) is granted in part and denied in part; it is further

**ORDERED**, that defendant's motion for summary judgment and dismissal of plaintiff's breach of contract, gross negligence and fraud claims relating to the gross revenue and New York State taxes is **GRANTED;** it is further

**ORDERED**, that Count 7 of the Amended Complaint is dismissed; it is further

**ORDERED**, that defendant's motion for summary judgment and dismissal of plaintiff's fraud claims (Counts 5 and 6) is **GRANTED**; it is further

**ORDERED**, that defendant's motion for summary judgment and dismissal of plaintiff's complaint is otherwise **DENIED**; it is further

**ORDERED**, that defendant's motion for summary judgment and an award of damages on the counterclaims is **DENIED**; it is further

**ORDERED**, that defendant's motion to exclude Stu Sleppin as an expert witness (Dkt. No. 94) is **GRANTED** to the extent discussed above; it is further

**ORDERED**, that defendant's motion to exclude David Malfara as an expert witness (Dkt. No. 96) is **GRANTED IN PART AND DENIED IN PART**, consistent with this Order.

**IT IS SO ORDERED.**

Dated:  May 6, 2013
         Albany, New York

Mae A. D'Agostino
U.S. District Judge